**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EZEQUIEL NUNEZ CORNEJO,
                *Plaintiff-Appellant,*

                v.

COUNTY OF SAN DIEGO; CITY OF
SAN DIEGO; CITY OF ESCONDIDO;
THE CITY OF OCEANSIDE; PAUL
LACROIX; WILLIAM MCDANIEL,
California Deputy Sheriff; JON
MONTION; DOES 1-100; CITY OF
CARLSBAD,

                *Defendants-Appellees.*

No. 05-56202

D.C. No.
CV-05-00726-MLH

OPINION

Appeal from the United States District Court
for the Southern District of California
Marilyn L. Huff, District Judge, Presiding

Argued and Submitted
June 25, 2007—Pasadena, California

Filed September 24, 2007

Before: Arthur L. Alarcón, Dorothy W. Nelson, and
Pamela Ann Rymer, Circuit Judges.

Opinion by Judge Rymer;
Dissent by Judge D.W. Nelson

12981

## COUNSEL

Genaro Lara, Vista, California, (argued); Emile M. Mullick, San Bernardino, California, for the plaintiffs-appellants.

Donald Shanahan, San Diego, California, (argued); David Axtman, San Diego, California, (argued); Susan D. Ryan, Escondido, California; Ronald R. Ball, Carlsbad, California; David M. Daftary, Oceanside, California, for the defendants-appellees.

Douglas N. Letter (argued), Sharon Swingle, Department of Justice, Washington, D.C., for amicus curiae the United States.

## OPINION

RYMER, Circuit Judge:

This appeal requires us to resolve an issue left open in our en banc decision in *United States v. Lombera-Camorlinga*, 206 F.3d 882, 884 (9th Cir. 2000): whether Article 36 of the Vienna Convention on Consular Relations[1] creates judicially enforceable rights that may be vindicated in an action brought under 42 U.S.C. § 1983.

Ezequiel Nunez Cornejo's complaint seeks damages and injunctive relief against the County of San Diego, several deputy sheriffs, and various cities within the county on behalf of a class of foreign nationals who were arrested and detained without being advised of their right to have a consular officer notified as required by Article 36. The district court dismissed the action, concluding that Cornejo could not bring a § 1983 claim for violation of the Convention because it creates no private rights of action or corresponding remedies.

We agree with the district court that Article 36 does not create judicially enforceable rights. Article 36 confers legal rights and obligations on *States* in order to facilitate and pro-

---

[1]April 24, 1963, 21 U.S.T. 77, 100-101, 569 U.N.T.S. 261.

mote consular functions. Consular functions include protecting the interests of detained nationals, and for that purpose detainees have the right (if they want) for the consular post to be notified of their situation. In this sense, detained foreign nationals benefit from Article 36's provisions. But the right to protect nationals belongs to *States* party to the Convention; no private right is unambiguously conferred on individual detainees such that they may pursue it through § 1983. Accordingly, we affirm.

I

Cornejo is a national and citizen of Mexico. His First Amended Complaint alleges that when he was arrested, San Diego County Sheriff's Deputies Paul LaCroix, William McDaniel, and Jon Montion failed to inform him, and others similarly situated whom he seeks to make part of a class, of the individual right conferred by Article 36 and by California Penal Code § 834c, "to contact a consular official of his country." He claims that in this, the County and the deputies violated the class's due process rights and "right of information which would have assisted them and would have resulted in a different outcome of their case had they been provided with consular and legal assistance."[2] The complaint prays for damages, a declaration that the practices and customs of the county and cities violate individual rights under the United States Constitution and California Penal Code § 834c, and for an order requiring compliance with the mandatory provisions of the Convention and California Penal Code § 834c.[3]

---

[2]The complaint says nothing about a prosecution or conviction, nor does the record contain any such evidence. Accordingly, we assume that *Heck v. Humphrey*, 512 U.S. 477 (1994), which precludes a § 1983 action when a judgment in favor of the plaintiff would necessarily imply invalidity of his conviction or sentence unless the conviction or sentence has already been invalidated, is not implicated.

[3]We note that a claim for violation of state law is not cognizable under § 1983. *See Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990).

The County, deputy sheriffs, and City moved to dismiss for failure to state a claim. The district court granted the motions, thereby mooting Cornejo's request for class certification. It ruled that he could not state a claim under § 1983 for violations of the Vienna Convention because Article 36 does not provide for a private right of action; that his *Monell*[4] claim against the county and cities failed as he was not deprived of a constitutionally protected interest; and that, in any event, Cornejo pled no harm on account of anything done by Carlsbad, Escondido, San Diego, or Oceanside.

Cornejo timely appealed, and the United States has appeared as amicus curiae in support of the county, deputy sheriffs, and the cities.

II

[1] The Vienna Convention is a multilateral international agreement "that governs relations between individual nations and foreign consular officials." *Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2691 (2006) (Breyer, J., dissenting). Adopted in 1963, 170 States are States parties.[5] The United States ratified the Convention in 1969. *Id.* Article 36 provides:

### Communication and contact with nationals of the sending State

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

---

[4] *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 690-91 (1978) (holding that a plaintiff states a civil rights claim against a municipality under § 1983, by showing that he has suffered a deprivation of a constitutionally protected interest; and that the deprivation was caused by an official policy, custom or usage of the municipality).

[5] The Convention entered into force on March 19, 1967. *See* 596 U.N.T.S. at 261.

(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this subparagraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgement. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this article are intended.

21 U.S.T. 77, 100-101. Here, Mexico is the "sending State" and the United States is the "receiving State."

For any treaty to be susceptible to judicial enforcement it must both confer individual rights and be self-executing. There is no question that the Vienna Convention is self-executing. As such, it has the force of domestic law without the need for implementing legislation by Congress. *See* U.S. Const., art. VI, cl. 2 ("[A]ll Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby . . . ."); *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829); *Medellín v. Dretke*, 544 U.S. 660, 686 (2005) (O'Connor, J., dissenting) (citing *Head Money Cases*, 112 U.S. 580, 598-99 (1884)). But "the questions of whether a treaty is self-executing and whether it creates private rights and remedies are analytically distinct." *Id.* at 687; Restatement (Third) of Foreign Relations Law of the United States § 111 cmt. h (hereinafter Restatement). "While a treaty must be self-executing for it to create a private right of action enforceable in court without implementing domestic legislation, all self-executing treaties do not necessarily provide for the availability of such private actions." *Renkel v. United States*, 456 F.3d 640, 643 n.3 (6th Cir. 2006).

**[2]** Therefore, the question here is whether Congress, by ratifying the Convention, intended to create private rights and remedies enforceable in American courts through § 1983 by individual foreign nationals who are arrested or detained in this country. It is an open question for us.[6] Only the Seventh

---

[6]Sitting en banc in *Lombera-Camorlinga*, we vacated a panel opinion holding that Article 36 created an individual right that was enforceable by way of a motion to suppress evidence of post-arrest statements made by a foreign national before being advised of the right to notification of this consulate. 206 F.3d at 883. Although we discussed the panel's holding and noted there was "some support" for this view, we did not decide the issue because we held that even if some judicial remedies are available for violation of Article 36, the exclusion of evidence is not one of them. *Id.* at 885.

Circuit Court of Appeals has answered this question squarely, and did so affirmatively in *Jogi v. Voges*, 480 F.3d 822 (7th Cir. 2007). However, other circuits that have considered violations of Article 36 in criminal proceedings point in the opposite direction. Two have concluded that the Convention confers no enforceable individual rights, *United States v. Jimenez-Nava*, 243 F.3d 192, 197-98 (5th Cir. 2001) (rejecting argument that Article 36 creates enforceable individual rights and declining to apply the exclusionary rule as an appropriate remedy for an Article 36 violation); *United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001), and others have held that regardless of whether it does or not, remedies such as dismissal of the indictment or suppression of evidence are not available. *United States v. De La Pava*, 268 F.3d 157, 164-65 (2d Cir. 2001) (suggesting, but not deciding, that the Convention does not confer judicially-enforceable rights for individuals); *United States v. Li*, 206 F.3d 56 (1st Cir. 2000) (en banc) (same), *id.* at 66 (Selya & Boudin, JJ., concurring) (stating that "[n]othing in [its] text explicitly provides for judicial enforcement of their consular access provisions at the behest of private litigants"); *United States v. Minjares-Alvarez*, 264 F.3d 980, 986-87 (10th Cir. 2001); *United States v. Cordoba-Mosquera*, 212 F.3d 1194, 1196 (11th Cir. 2000); *United States v. Santos*, 235 F.3d 1105, 1108 (8th Cir. 2000) (holding that any violation of Article 36 was harmless error), *id.* at 1109 (Beam, J., concurring) (stating that the Convention confers "no individually enforceable right under Article 36 to be informed of a right to consular notification . . . ."); *see also Murphy v. Nederland*, 116 F.3d 97, 100 (4th Cir. 1997) (concluding that habeas petitioner "failed to establish prejudice from the alleged violation of the Vienna Convention because he is unable to explain how contacting the Mexican consulate would have changed either his guilty plea or his sentence"). The Supreme Court has confronted similar issues arising out of Article 36, but not this one. *See, e.g., Sanchez-Llamas*, 126 S. Ct. at 2677-87 (2006) (assuming in habeas proceedings that Article 36 grants individuals enforceable rights but finding no authority in the Con-

vention itself for suppressing evidence and declining to impose the exclusionary rule on Oregon as a remedy; applying procedural bar rule to claims asserted by habeas petitioner despite contrary interpretation of the International Court of Justice); *Breard v. Greene*, 523 U.S. 371 (1998) (per curiam) (applying Virginia's procedural default doctrine to a Vienna Convention claim on habeas review; remarking that "[a]ny rights that the Consul General might have by virtue of the Vienna Convention exist for the benefit of [the sending State], not for him as an individual.").[7]

[3] As Cornejo's claim is pursuant to § 1983, which provides a vehicle for seeking relief for violation of the "Constitution and laws,"[8] we are guided by the Supreme Court's treatment of the analogous issue of enforcement of personal rights arising under federal statutes through § 1983. It is clear from *Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002), that "it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." Thus, an "unambiguously conferred right" phrased in terms of the person benefitted is essential before a statute — and by extension, a treaty having the force of federal law — may support a cause of action under § 1983. *Id.*, at 282-83.

"In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992). As it is a treaty that is being construed, however, and a treaty is an agreement

---

[7]The Court granted certiorari in *Medellín v. Dretke*, 544 U.S. 660 (2005), to consider whether a federal court is bound by a ruling of the International Court of Justice, but dismissed it as improvidently granted in light of an intervening memorandum from the President that the United States would discharge its international obligations.

[8]We note the government's submission that "laws" cannot include treaties, but we have no need to confront the issue given our disposition. Rather, we assume for purposes of this case that a treaty such as this one that is self-executing and thus law, has that status. *See Baldwin v. Franks*, 120 U.S. 678 (1887); *Maine v. Thiboutot*, 448 U.S. 1 (1980).

between States that implicates the foreign relations of the United States, we are also aided by canons that apply specially to international agreements. Among them: "While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight." *Sanchez-Llamas*, 126 S. Ct. at 2685 (quoting *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961)). "An international agreement is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose." Restatement § 325(1). In that connection, the "context" of a treaty includes its preamble. Vienna Convention on the Law of Treaties ("Treaty Convention") art. 31(2), May 23, 1969, 1155 U.N.T.S. 331. "[S]ubsequent practice between the parties in the application of the agreement [is] to be taken into account in its interpretation." Restatement § 325(2).[9]

**[4]** Treaties customarily confer rights upon the States that are parties to them. While treaties *may* confer enforceable individual rights, *see, e.g., Head Money Cases*, 112 U.S. 580, 598-99 (1884); *Lombera-Camorlinga*, 206 F.3d at 885, most courts accept a "presumption" against inferring individual rights from international treaties. *See Emuegbunam*, 268 F.3d at 389; *De La Pava*, 268 F.3d at 164; *Jimenez-Nava*, 243 F.3d at 195-96; *but see Sanchez-Llamas*, 126 S. Ct. at 2697 (Breyer, J., dissenting). Whether or not aptly characterized as a "presumption," the general rule is that "[i]nternational agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private

---

[9]The dissent ignores the canons that apply to international agreements, and otherwise goes off track by treating this case as if it involved a *statute* instead of a *treaty*. For example, the dissent accuses us of misunderstanding *Gonzaga*, dissenting op. at 13001, 13004-05, 13010, 13015 — but the question there was whether a private right of action could be implied in spending legislation; *Gonzaga* does not purport to answer the question before us, which concerns how a treaty is to be interpreted. Treaties are different from statutes, and come with their own rules of the road.

cause of action in domestic courts, but there are exceptions with respect to both rights and remedies." Restatement § 907 cmt. a; *see, e.g., Argentine Republic v. Amerada Hess Shipping Co.*, 488 U.S. 428, 442 (1989) (Even where treaties provide compensation for breaches by States they "only set forth substantive rules of conduct . . . . They do not create private rights of action for foreign corporations to recover compensation from foreign states in United States courts.").[10]

Against this backdrop, Cornejo's most compelling argument is that Article 36 textually uses the word "rights" in reference to a detainee's being informed that he can, if he wants, have his consular post advised of his detention and have communications forwarded to it. This use of the word in paragraph 1(b) "arguably confers on an individual the right to consular assistance following arrest." *Breard*, 523 U.S. at 376. However, it says nothing about the nature of "his rights" or how, if at all, they may be invoked. This language, therefore, must be considered in light of what the Convention, and Article 36, are all about. Restatement § 325(1) (noting that treaty terms are to be construed in their context and in the light of the treaty's object and purpose).

Entitled "Communication and contact with nationals of the sending State," Article 36 appears in Section I of Chapter II of the Convention. Chapter II governs "Facilities, Privileges

---

[10]Few cases have permitted private enforcement of a treaty in U.S. courts. *See, e.g., Kolovrat*, 366 U.S. at 191 (heirs could invoke 1881 Treaty of Friendship, Navigation, and Commerce between the United States and Yugoslavia to secure inheritance denied by Oregon law); *Olympic Airways v. Husain*, 540 U.S. 644, 646 (2004) ("Article 17 of the Warsaw Convention . . . imposes liability on an air carrier for a passenger's death or bodily injury caused by an 'accident' that occurred in connection with an international flight.") Other treaties, by their terms, provide a forum in domestic courts for adjudicating treaty violations. *See* United States—Ecuador Bilateral Investment Treaty art. VI, cl. 2(a), August 27, 1993, S. Treaty Doc. 103-15 (1993) (foreign national may bring claims arising from investment dispute "to the courts or administrative tribunals of the [State] that is a party to the dispute").

and Immunities Relating to Consular Posts, Career Consular Officers and Other Members of a Consular Post," while Section I concerns "Facilities, Privileges and Immunities Relating to a Consular Post." The lead sentence in paragraph 1 of Article 36, which is the paragraph that obliges authorities of a receiving State to notify a detained foreign national of "his rights" under sub-paragraph (1)(b), declares that the rights set forth in that section are "[w]ith a view to facilitating the exercise of *consular functions* relating to nationals of the sending State." (emphasis added). As defined in Article 5, "consular functions" consist in, among other things, "(a) protecting in the receiving State the interests of the sending State and of its nationals, both individuals and bodies corporate, within the limits permitted by international law; . . . [and] (e) helping and assisting nationals, both individuals and bodies corporate, of the sending State." Thus, the "rights" accorded under Article 36 are meant to facilitate the exercise of consular functions, an important one of which is to help nationals who run afoul of local law.

**[5]** Accordingly, sub-paragraph 1(a) gives consular officials the right "to communicate with nationals of the sending State and to have access to them." The exchange of information provided for in sub-paragraph 1(b) supports the consular function and the rights conferred in sub-paragraph 1(a) upon consular officers to communication and access. And sub-paragraph 1(c) guarantees consular officials the right to visit a national of the sending State who is detained or incarcerated, as well as to converse and correspond with him and to arrange for his legal representation — if the national wants that kind of help and if the consulate wants to give it.

**[6]** These "rights" are consistent with the articulated purpose of facilitating the exercise of consular functions, not with awarding compensation to individual detainees who receive no notification from their arresting officers. Requiring a receiving State to notify a foreign national that, if he wishes, it will inform the local consular post of an arrest or detention,

and forward communications, enhances the ability of sending States to assist or protect their nationals. In this way, notification is "a means of implementing the treaty obligations *as between States*. Any other way of phrasing the promise would be both artificial and awkward." *Li*, 206 F.3d at 66 (Selya & Boudin, JJ., concurring). This, in turn, allows the sending State to decide what, if any, assistance it will provide. But at the end of the day, the right of assistance, as Article 36(1)(c) makes clear, belongs entirely to the sending State.

**[7]** We conclude, therefore, that the unmistakable focus of Article 36 is on *consular functions*. The privileges discussed are explicitly those relating to *the consular post*. They are manifestly important, because Article 36 provides for communication and contact by sending States with their nationals who are in trouble in a foreign country. However, the signatory States did not choose to delegate enforcement of Article 36 — even to their own consular officials.[11] They plainly did not do so to individual foreign nationals. For all these reasons, we cannot see unambiguous clarity in the language of Article 36 implying that the States parties to the Convention conferred a private, judicially enforceable right upon individuals. *Gonzaga*, 536 U.S. at 283-84.

---

[11]There are two routes for remedying violations of Article 36: diplomatic channels through which governments may protest failure to observe the terms of Article 36, and dispute resolution through The Optional Protocol Concerning the Compulsory Settlement of Disputes, April 24, 1963, 21 U.S.T. 325, 596 U.N.T.S. 487. Diplomacy is obviously a mechanism belonging to *States*. The Protocol likewise applies only to *parties*, and only States are parties. It provides that disputes arising out of the interpretation or application of the Convention shall be within the compulsory jurisdiction of the International Court of Justice (ICJ) and may be brought before the ICJ "by an application made by any party to the dispute being a Party to the present Protocol," art. I, or to an arbitral tribunal by agreement of "[t]he parties," art. II. Only States are parties to the Convention, and only States may bring proceedings before the ICJ. The United States joined the Protocol, but has since noticed its withdrawal. Letter from Condoleeza Rice, Secretary of State, to Kofi A. Annan, Secretary-General of the United Nations (March 7, 2005).

This conclusion is buttressed by the Convention as a whole, the contemporaneous understanding of Congress in ratifying it as well as the view of the Department of State, and the uniform practice of States implementing it over the years.[12]

The Vienna Convention on Consular Relations is an agreement among States whose subject matter — "Consular Relations" — is quintessentially State-to-State. Except for its final provisions, the Convention's articles all have to do with consular posts. Indeed, the Preamble notes the belief of the States parties that "an international convention on consular relations, privileges and immunities would . . . contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems"; and their realization that "the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States."[13] *Cf. Gonzaga*, 536 U.S. at 284 (to imply enforceable private rights, a statute's "text must be 'phrased in terms of the person benefitted.' ") (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n.13 (1979)). As the International Court of Justice explained, the Convention establishes an "interrelated régime" of international legal obli-

---

[12]The dissent faults us for buttressing our conclusion with "extratextual sources," dissenting op. at 13004-015, but the terms of a treaty are by canon and international convention construed in light of the treaty's object and purpose, including its preamble. Treaty Convention art. 31(2); Restatement § 325(1). Because it is a treaty that is being interpreted, the meaning given to its terms by the Department of State is entitled to great weight. *Sanchez-Llamas*, 126 S. Ct. at 2685. And subsequent practice also matters. Restatement § 325(2).

[13]We rely on the Preamble not to create an ambiguity, as the dissent implies, dissenting op. at 13006 (quoting *Jogi* that to do so is a mistake), but to provide context for the terms of Article 36(1)(b). This is perfectly proper, for a treaty must be interpreted as a whole in light of its object and purpose, including the preamble. Treaty Convention art. 31(2); Restatement § 325(1). As the Preamble to the Vienna Convention specifically says, this particular treaty was meant to facilitate consular functions. Article 36(1)(b) does this, by allowing consular officials to aid their nationals.

gations in order to protect, and facilitate the work of, consular officers. *LaGrand Case* (Germany v. U.S.), 2001 I.C.J. 466, 492 ¶ 74 (June 27).

Cornejo suggests that the proviso in paragraph 2 manifests an intent to create privately enforceable rights. Nowhere does it say so. If anything, the fact that it talks in terms of how "rights referred to in paragraph 1 of this article shall be *exercised*" indicates the opposite, for it does not also say "and be compensated."[14] Moreover, just as paragraph 2 recognizes that the "rights" are to be exercised in conformity with the laws and regulations of the receiving State, it provides that those laws and regulations "must enable full effect to be given *to the purposes for which the rights accorded under this article are intended*." The only articulated purpose is in paragraph 1, and it is to facilitate the exercise of consular functions relating to nationals of the sending State.

To the extent that Congressional intent in ratifying the Convention may be discerned, it, too, supports our interpretation. For example, the Report of the Committee on Foreign Relations recommending that the Senate give its advice and consent to ratification of the Convention emphasizes the preamble: "The general functional approach of the Convention is pointed up by the following preambular statement: '* * * the purpose of such privileges and immunities is not to

---

[14]As Judge Thomas put it, dissenting from our refusal to apply the exclusionary rule in *Lombera-Camorlinga,*

> The Treaty does not provide expressly for private damage actions. Rather, the plain words of the Treaty provide that the notification right "shall be exercised," not that failure to notify should be compensated. Thus, the Treaty would not seem to contemplate private damage actions, and it would not be sound judicial policy to conjure legal theory that would expose individual officers to liability for breaches of international treaties. The decision on whether to attach individual liability for such violations should be left to Congress.

206 F.3d at 895.

benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States.' " S. Exec. Rep. 91-9, at 2 (1969). The Report also emphasizes the focus of Articles 28 to 57 on consular functions: "Consular facilities, privileges and immunities of consular officers and other members of a consular post are stated in Articles 28 to 57. Among other things, these articles concern inviolability of consular premises, archives, and documents, freedom of movement and of communication, personal inviolability of consular officers, privileges and immunities, including exemptions from social security regulations, taxation, customs duties and inspection." *Id.* Further, the Report identified several factors that "weighed in the Committee's decision." The first was: "The Convention does not change or affect present U.S. laws or practices."[15] *Id.* Had Article 36 been thought to create enforceable individual rights, it is unlikely the Committee would have said this; creating a right in a foreign national to sue for violations of an international treaty in American courts would have been unprecedented in 1969. Another factor weighing in favor of its recommendation was that "[a]s a sending state, it is important that the United States obtain for its consular service the prerogatives necessary for it to function effectively abroad." *Id.* at 3. Again, the focus was on obtaining rights to enable its *consular service* to function effectively; there is no comment, or focus, at all on obtaining for its nationals a right of any sort that would be privately enforceable in the courts of receiving States.

---

[15]*Li* additionally notes that a 1970 letter sent by a State Department legal adviser to the governors of the fifty states after the Convention was ratified advised that the Department did "not believe that the Vienna Convention will require significant departures from the existing practice within the several states of the United States." 206 F.3d at 64. As the court remarked: "Needless to say, the creation of rights on par with those guaranteed by the Fourth, Fifth, and Sixth Amendments to the United States Constitution would constitute just the sort of 'significant departure[ ]' disclaimed by this letter." *Id.*

The contemporaneous position of the United States Department of State, which is entitled to "great weight," *United States v. Stuart*, 489 U.S. 353, 369 (1989), also reinforces the view that the Convention as a whole, and Article 36 in particular, were not intended to create individually enforceable rights. For example, when the Senate was considering ratification, one of the deputy legal advisers to the State Department informed the Foreign Relations Committee that, "[i]f problems should arise regarding the interpretation or application of the convention, such problems would probably be resolved through diplomatic channels." S. Exec. Rep. 91-9, app., at 19. Failing that, he represented, disputes would be submitted to the ICJ pursuant to the Optional Protocol. *Id.* Since then, the Department has repeatedly asserted that "the only remedies for failures of consular notification under the Vienna Convention are diplomatic, political, or exist between states under international law," *Emuegbunam*, 268 F.3d at 392, and that "[t]he right of an individual to communicate with his consular official is derivative of the sending state's right to extend consular protection to its nationals," *Li*, 206 F.3d at 63.

Cornejo points out that in his Letter of Transmittal to the President, Secretary of State William P. Rodgers stated that Article 36 "requires that authorities of the receiving State inform the person detained of his right to have the fact of his detention reported to the consular post concerned and of his right to communicate with that consular post." *Li*, 206 F.3d at 74 (Torruella, C.J., concurring in part, dissenting in part, quoting the Secretary's letter transmitting the certified copy of the Convention). This statement, however, simply mirrors the provision itself, which unquestionably refers to "rights," without shedding light on whether its intent was (or was not) to create privately enforceable rights. By the same token, the Report of the United States Delegation to the Conference that resulted in the Convention states of Article 36 that it "is useful to the consular service of the United States in the protection of our citizens abroad." *Id.* (quoting Report of the United States Delegation to the United Nations Conference on Con-

sular Relations, Vienna, Austria, March 4 to April 22, 1963). This comports with our construction, and the apparent understanding of the ratifying Congress.

Given that Article 36 does not unambiguously confer a right in individual detainees to support a cause of action under § 1983, we see no need for resort to the *travaux préparatoires*. Treaty Convention, art. 32(a), (b) (declaring that recourse to the *travaux préparatoires* is appropriate only where interpretation under Article 31 of the Treaty Convention leaves the meaning ambiguous or leads to a "result which is manifestly absurd or unreasonable"); *see* 1-2 Official Records, United Nations Conference on Consular Relations, Vienna, March 4 — April 22, 1963. Suffice it to say, the *travaux préparatoires* is consistent with the State Department's position; there is no indication that States intended the enforcement of a "right" to consular notification in the courts of the receiving State. To the extent the *travaux préparatoires* is susceptible to different interpretations, it is too ambiguous under domestic law — which controls the exercise of rights pursuant to paragraph 2 of Article 36 — to create a privately enforceable right not explicitly found in the text.

Finally, the government represents that none of the 170 States parties has permitted a private tort suit for damages for violation of Article 36. *See also Li*, 206 F.3d at 65 (relating similar advice from the State Department with respect to remedying failures of notification through a domestic criminal justice process). This is consistent with the State Department's position that the remedies "are diplomatic, political, or exist between states under international law." *Id.* at 63 (quoting the Department of State Answers to the Questions posed by the First Circuit in *United States v. Nai Fook Li* at A-3).[16]

___

[16]In *LaGrand*, for example, Germany brought a claim in the ICJ for breach of Article 36 by the United States and, invoking its right of diplomatic protection, also contended that the breach violated the individual rights of the LaGrand brothers who had not been informed of their rights

**[8]** Accordingly, we hold that Article 36 does not unambiguously give Cornejo a privately enforceable right to be notified. For sure, he should have been notified. The government agrees; the State Department and the Department of Homeland Security have regulations in place that track the requirements of Article 36. So does the State of California. It is important to the United States that its treaty obligations be fulfilled, otherwise reciprocity is jeopardized. However, the "rights" in Article 36 were intended to facilitate the exercise of consular functions. That is how the treaty was understood by the United States Department of State and Congress. And it is how the treaty has been understood in practice by all its signatories. While Article 36 may also benefit an individual detainee when properly followed, benefit is not enough to pass the *Gonzaga* test. We therefore agree with the district court that Cornejo cannot state a claim under § 1983.

AFFIRMED.

---

D.W. NELSON, Senior Circuit Judge, dissenting:

The question that we should address, in accordance with Supreme Court precedent in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), is whether Article 36(1)(b) of the Vienna Convention on Consular Relations ("Vienna Convention"), Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, 596 U.N.T.S. 261, was intended to confer individual rights that would be presumptively enforceable under 42 U.S.C. § 1983. Instead of addressing this question, the majority relies on an erroneous

under Article 36, paragraph 1. The ICJ concluded that the individual rights could be invoked in that court by the national State of the detained person. 2001 I.C.J. at 494, ¶ 77. By invoking diplomatic protection, and espousing the claim of its national in the ICJ, Germany was in reality "asserting its *own* rights." *The Mavrommatis Palestine Concessions*, 1924 P.C.I.J. (ser. A) No. 2, at 11-12 (August 30) (emphasis added).

interpretation of *Gonzaga* and reframes the question as being "whether Congress, by ratifying the Convention, intended to create private rights *and remedies enforceable in American courts through § 1983*." Maj. Op. at 12988. The requirement that the appellant in this case, Cornejo, demonstrate that the ratifying Congress had an intent to create remedies enforceable in American courts through § 1983 finds no support in case law. Instead, such a remedy under § 1983 is presumptively available once Cornejo demonstrates that the ratifying Congress of the Vienna Convention had an intent to confer individual rights in Article 36(1)(b). Therefore, I respectfully dissent because it is clear that Article 36(1)(b) does confer individual rights and the presumption of a remedy under § 1983 has not been overcome.

## I.   *Gonzaga University v. Doe*

I agree with the majority that *Gonzaga* establishes the standard under which we are to determine whether Cornejo can rely on § 1983 to enforce the Vienna Convention. However, the majority seems to rely on a fundamental misunderstanding of the reasoning in *Gonzaga*.[1] In *Gonzaga*, the Supreme Court

---

[1]The majority seems to imply that the analysis in *Gonzaga* does not apply because this case involves a treaty and not a statute. Maj. op. at 12991 n 9. In particular, the majority explains that treaties are different from statutes and contends that treaties "come with their own rules of the road." Yet the majority cites no authority to support employing a different standard for determining whether a treaty is enforceable under § 1983 than the standard which the Supreme Court applied to statutes in *Gonzaga*. *See id*. Adopting a distinct standard would be contrary to the approach taken by the Seventh Circuit in *Jogi*, which is the only court that "has answered . . . squarely [the question of whether Article 36 of the Vienna Convention was enforceable under § 1983]." *See* maj. op. at 12989. The Seventh Circuit clearly applied the *Gonzaga* standard and held that individual rights, once identified in the treaty, were presumptively enforceable under § 1983. *See Jogi*, 480 F.3d at 827-836. Thus, by not applying the *Gonzaga* standard, the majority creates its own novel standard for determining whether a treaty is enforceable under § 1983. This novel approach is one with which I cannot concur.

determined that "[§] 1983 provides a remedy only for the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States." *Id.* at 283. As a result, "it is rights, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [§ 1983]." *Id.* The Court recognized the important distinction between the question of "whether a statutory violation may be enforced through § 1983 [and] whether a private right of action can be implied from a particular statute" that the majority seems to confuse. *Id*. at 284. Parties suing under an implied right of action theory "must show that the statute manifests an intent to create not just a private *right* but also a private *remedy*." *Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)) (emphasis in original). However, parties such as Cornejo, who are only seeking to enforce a statutory violation through § 1983, "do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Id.* at 284. Instead, "[o]nce a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Id.* Thus, the question of whether there was an intent under Article 36(1)(b) to create a private remedy, for which the majority places much weight, is irrelevant to the issue of whether Cornejo can enforce the treaty violation through § 1983. Instead, the only question relevant to Cornejo's claim is whether Article 36(1)(b) confers individual rights "on a particular class of persons." *Id.* at 285.

## II.   Text of Article 36(1)(b) of the Vienna Convention

To determine whether Article 36(1)(b) confers individual rights on a particular class of persons, we must first look to the language of the treaty. *See id.* at 287 (examining the language of the statute). In order for the treaty to confer individual rights, "its text must be phrased in terms of the persons benefitted." *Id.* at 284 (citation and internal quotation mark omitted). Article 36(1)(b) states:

If [the national of the sending State] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this subparagraph.*

Vienna Convention, Art. 36(1)(b). Article 36(1)(b) speaks rather clearly in rights-conferring language as it "instructs authorities of a receiving State to notify an arrested foreign national of 'his rights' under the Convention 'without delay.' " *Jogi v. Voges*, 480 F.3d 822, 829 (7th Cir. 2007). The language in Article 36(1)(b) is distinct from the statutory language in *Gonzaga* that the Supreme Court held did not confer individual rights. In that case, the appellant was seeking enforcement through § 1983 of a provision "directing that no funds shall be made available to any educational agency or institution which has a prohibited policy or practice." *Gonzaga*, 563 U.S. at 287. Unlike Article 36(1)(b), the statute at issue in *Gonzaga* did not speak anywhere of the rights of anyone. In contrast, Article 36(1)(b) and particularly the last sentence with the reference to "his rights" "satisfies the strict test of clarity" established by the Supreme Court in *Gonzaga. Id.* at 833.

The majority seems to agree as well stating that "[the] use of the word ["rights"] in paragraph 1(b) 'arguably confers to an individual the right to consular assistance following arrest.' " Maj. Op. at 12992 (quoting *Breard v. Greene*, 523 U.S. 371, 376 (1998)). Nonetheless, the majority rejects Cornejo's claim for relief under § 1983 because the treaty "says nothing about the nature of 'his rights' or how, if at all,

they may be invoked." *Id*. *Gonzaga* does not require that the treaty say anything about the nature of his rights or how, if at all, they may be invoked. Instead, *Gonzaga* requires only that the rights be "conferr[ed] on a particular class of persons." *Gonzaga*, 536 U.S. at 285. In this case, the right is conferred on foreign nationals who are detained or arrested by competent authorities of the receiving State. These foreign nationals have a right to be informed that the competent authorities are required upon request of the foreign national to notify the sending State of the arrest or detention.

In spite of the clear language in Article 36(1)(b) referencing "his rights" and the conferral of the right on a particular class of persons, the majority contends that this right belongs entirely to the sending State. *See* Maj. Op. at 12994. To support this contention, the majority looks to titles contained in the Vienna Convention and other subparagraphs within Article 36. However, such an interpretation is contrary to the clear language of Article 36(1)(b), which refers to "his rights" not to those of the sending State. If the drafters of the treaty intended that the rights in Article 36(1)(b) belong entirely to the State, it easily could have written language consistent with such a construction or simply omitted the last sentence of Article 36(1)(b). Instead, as will be discussed in greater detail below, the drafters of the treaty included this language to make clear that individuals have a right to be informed that competent authorities are required to notify their consulates if they so request.

## III.    Extratextual Sources of Interpretation of Article 36(1)(b)

The majority seeks to buttress its conclusion that Article 36(1)(b) does not confer individual rights through an analysis of the Vienna "Convention as a whole, the contemporaneous understanding of Congress in ratifying it as well as the view of the Department of State, and the uniform practice of States implementing it over the years." Maj. Op. at 12995. Accord-

ing to *Gonzaga*, we do not need to address these sources because Article 36(1)(b) confers rights in "clear and unambiguous terms." *Gonzaga*, 536 U.S. at 290. In such cases, "no more . . . is required for Congress to create new rights." *Id.* Nonetheless, evaluating these sources demonstrates that they support the interpretation of Article 36(1)(b) as conferring an individual right.

First, the majority states that "[e]xcept for its final provisions, the Convention's articles all have to do with consular posts." *Id*. Assuming *arguendo* that this is the case, it does not foreclose the possibility that the drafters intended to protect the individual rights of foreign nationals in Article 36(1)(b) as made clear by the language of the provision. Instead, as will be discussed in greater detail below, the drafters understood Article 36(1)(b) to be a unique provision within the Vienna Convention that required extensive negotiations to secure passage.

Second, the majority relies on the Preamble to the Vienna Convention, which states:

> *Believing* that an international convention on consular relations, privileges and immunities would also contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems,
>
> *Realizing* that the purpose of such privilege and immunities *is not to benefit individuals* but to ensure the efficient performance of functions by consular posts on behalf of their respective States,
>
> *Affirming* that the rules of customary international law continue to govern matters not expressly regulated by the provisions of the present Convention,
>
> Have *agreed* as follows: . . .

Vienna Convention, pmbl. The majority contends that the language in the preamble stating that "the purpose of such privileges and immunities is not to benefit individuals" supports its contention that no part of the Vienna Convention, including Article 36(1)(b), was intended to confer individual rights. *See* Maj. Op. at 12995.

The Seventh Circuit has explained, "[i]t is a mistake to allow general language of a preamble to create an ambiguity in specific statutory or treaty text where none exists. Courts should look to materials like preambles and titles only if the text of the instrument is ambiguous." *Jogi*, 480 F.3d 822. This explanation is consistent with a long-standing rule of statutory construction that a statute "clear and unambiguous in its enacting parts, may [not] be so controlled by its preamble as to justify a construction plainly inconsistent with the words used in the body of the statute." *Price v. Forrest*, 173 U.S. 410, 427 (1899). In other words, a preamble cannot be relied upon to create ambiguity in a statute. In this case, the text of Article 36(1)(b) is clear in conferring rights on individuals. Therefore, looking to the preamble is inappropriate.

More importantly, we have specifically rejected reliance on the preamble as support for the argument that Article 36 creates no individual rights. *United States v. Lombera-Camorlinga*, 206 F.3d 882, 884 (9th Cir. 2000). Instead, we explained that "the protection of some interests of aliens as a class is a corollary to consular efficiency." *Id.* (citing *United States v. Calderon-Medina*, 591 F.2d 529, 531 n.6 (9th Cir. 1979)). Therefore, we concluded, "[t]he preamble is not particularly helpful to our analysis" of whether Article 36(1)(b) confers an individual right. *Id.* The majority does not explain why, contrary to our precedent on the issue, the preamble is now a useful guide to determining whether Article 36(1)(b) confers an individual right.

The majority also does not address an interpretation of the preamble that would be consistent with a rights-conferring

Article 36(1)(b). The Seventh Circuit in *Jogi* explained, "the most reasonable understanding of this language is as a way of emphasizing that the Convention is not designed to benefit diplomats in their individual capacity, but rather to protect them in their official capacity." *Jogi*, 480 F.3d at 833; *see also United States v. Rodrigues*, 68 F.Supp. 2d 178, 182 (E.D.N.Y. 1999) ("[I]t appears that the purpose of [the Preamble] is not to restrict the individual notification rights of foreign nationals, but to make clear that the Convention's purpose is to ensure the smooth functioning of consular posts in general, not to provide special treatment for individual consular officials."). Thus, the language in the preamble explaining that "such privileges and immunities are *not to benefit individuals*" more reasonably refers to the fact that the privileges and immunities contained in the Vienna Convention are not intended to benefit consul in their individual capacity. Protecting the rights of detained foreign nationals is perfectly consistent with this interpretation of the Preamble.

Third, the majority relies on congressional intent in ratifying the Convention. The majority first looks to statements in the Report of the Committee on Foreign Relations describing the function of the Vienna Convention in terms of the preamble. As discussed above, the language in the preamble does not support the majority's conclusion that Article 36(1)(b) does not confer individual rights. As a result, what amounts to a mere reiteration of the language of the preamble by the Committee on Foreign Relations in their discussion of the treaty is similarly unhelpful.

The majority then quotes the Report of the Committee on Foreign Relations, which states:

> Consular facilities, privileges and immunities of consular officers and other members of a consular post are stated in Article 28 to 57. Among other things, these articles concern inviolability of consular premises, archives, and documents, freedom of movement

and of communication, personal inviolability of con-
sular officers, privileges and immunities, including
exemptions from social securities regulation, taxa-
tion, customs duties and inspections.

Maj. Op. at 12997. This is a particularly weak reed on which
to place any weight. It is true that Articles 28 to 57 discuss
consular facilities, privileges and immunities of consular offi-
cers and other members of a consular post, but the Committee
did not determine that these issues were to the exclusion of all
others. In fact, several articles fall outside of this broad
description. For example, Article 29 addresses the use of a
national flag and coat-of-arms, Article 37 addresses the
responsibility of the receiving State to notify the sending State
about information in the case of a death of a national of the
sending State, and Article 39 addresses consular fees and
charges. Thus, the fact that Article 36(1)(b) establishes rights
for foreign nationals, which is contrary to the Committee's
broad, paragraph description of thirty articles in the Vienna
Convention, should not carry any weight.

The majority lastly points to statements in the Report iden-
tifying factors that "weighed in the Committee's decision,"
which included the fact that "[t]he Convention does not
change or affect present U.S. laws or practices." Maj. Op. at
12997. The majority contends that the Committee would not
have made such a statement regarding the effect of the Vienna
Convention on U.S. law and practices if the treaty created a
right in a foreign national to sue, which "would have been
unprecedented in 1969." Maj. Op. at 12997. The majority's
analysis demonstrates confusion with regards to the *Gonzaga*
standard discussed above. The question under *Gonzaga* is not
whether the particular statute or treaty creates a right to sue,
but instead whether the statute or treaty confers an individual
right that is presumptively enforceable under § 1983. *See
Gonzaga*, 536 U.S. at 284-85. Thus, it is § 1983, not the
Vienna Convention, that would establish the right to sue. On
the basis of this proper understanding of the *Gonzaga* stan-

dard, it is not so unprecedented for the Vienna Convention to have conferred individual rights in 1969.

I agree that the fact that the conferring of individual rights on a particular class of persons in the Convention establishes a presumptive right of enforcement under § 1983 was likely not foreseen by the congressional ratifiers. This presumptive enforcement right is a product of recent case law establishing § 1983 as the enforcement mechanism for federal statutes and treaties. *See Maine v. Thiboutot*, 448 U.S. 1, 13-14 (1980) (explaining that the language "and laws" in § 1983 "must be read to include all federal statutes" and rejecting the contention that § 1983 only remedies violations of the Constitution or laws providing for equal rights of citizens); *Jogi*, 480 F.3d at 827 (concluding that the acceptance of the argument that treaties could not be remedied under § 1983 would "relegate treaties to second-class citizenship, in direct conflict with the Constitution's command"). However, this lack of foreseeability by the congressional ratifiers does not change the fact that the language of the statute that they ratified conferred rights to individual foreign nationals. Thus, consistent with the statement of the ratifiers, the Convention did not change or affect present U.S. laws or practices by granting foreign nationals a right to sue. Instead, it was case law interpreting the breadth of enforcement rights under § 1983 that established such a presumptive right.

Fourth, the majority contends that the contemporaneous position of the United States Department of State "reinforce[d] the view that the Convention as a whole, and Article 36 in particular, were not intended to create individually enforceable rights." Maj. Op. at 12998. The majority again confuses the *Gonzaga* standard. What is relevant under *Gonzaga* is whether the Convention creates individual rights, not whether it creates individually *enforceable* rights. *See Gonzaga*, 536 U.S. at 284-85. As will be discussed below, the enforceability of the right under § 1983 is determined in accordance with a standard unrelated to the specific language in the treaty.

Relying on this misunderstanding of the *Gonzaga* standard, the majority continues by quoting a statement from one of the deputy legal advisers to the State Department to the Foreign Relations Committee when the Committee was considering ratification. The adviser stated that "[i]f problems should arise regarding the interpretation or application of the convention, such problems *would probably* be resolved through diplomatic channels." Maj. Op. at 12998 (citing S. Exec. Rep. 91-9, app., at 19). The majority then paraphrases the adviser as stating, "[f]ailing that, he represented, disputes would be submitted to the ICJ pursuant to the Optional Protocol." *Id.* The majority ignores the context of these statements, which demonstrate that the adviser did not have in mind the issue of whether Article 36(1)(b) confers individual rights. The question posed to the adviser for which the above statements were responsive was as follows:

> Since the optional protocol establishes a procedure for referring disputes to the World Court in which the Connally amendment would not apply, do you foresee any cases arising in which you might regret not having the protection of the Connally Amendment?

The Connally amendment "provided that U.S. acceptance of the [ICJ's] jurisdiction did not apply to domestic matters, and that the United States reserved for itself the exclusive right to determine whether a particular matter was domestic." Paul S. Reichler, *Holding America to Its Own Best Standards: Abe Chayes and Nicaragua in the World Court*, 42 Harv. Int'l L.J. 15, 29 (2001). A more reasonable interpretation of the response to the question than that offered by the majority is that the adviser was trying to assure the Senate that the ICJ would not have the authority to resolve disputes that the United States considered domestic. Instead, such disputes would be resolved through diplomatic channels or, in the case of international disputes, the International Court of Justice (ICJ). Nothing can be inferred from the statement about

whether the State Department understood the Convention, and Article 36(1)(b) in particular, to confer individual rights.

However, if we look at the mechanisms for resolving disputes cited by the State Department advisors, a decision of the ICJ provides support for an interpretation of Article 36(1)(b) as conferring individual rights. Although, the decisions of the ICJ have "no binding force except between the parties and in respect of that particular case," *see* ICJ Statute, art. 34(1), they can provide persuasive support for a legal conclusion. In *LaGrand*, the ICJ held that Article 36(1)(b) "creates individual rights for the detained person in addition to the rights accorded the sending State, and that consequently the reference to 'rights' in paragraph [b] must be read as applying not only to the rights of the sending State, but also to the rights of the detained individual." *See* LaGrand Case (Germany v. U.S.), 2001 I.C.J. 466, at ¶ 89 (June 27); *see also id.* at ¶ 77. Thus, on the basis of the ICJ process of resolution of conflicting interpretations of the Vienna Convention, Article 36(1)(b) does confer individual rights.

The ICJ's determination is consistent with the contemporaneous understanding of Secretary of State William P. Rodgers. In the Letter of Submittal of the Vienna Convention to President Nixon, Secretary of State Rodgers indicated that:

> [Article 36(1)(b)] requires that authorities of the receiving State inform the person detained of *his right* to have the fact of his detention reported to the consular post concerned and *his right* to communicate with that consular post. *If he so requests*, the consular post shall be notified without delay.

*Li*, 206 F.3d at 74 (Torruella, C.J., concurring in part, dissenting in part, quoting the Secretary's letter transmitting the certified copy of the Convention) (emphasis added). The majority dismisses this statement as "simply mirror[ing] the provision itself, which unquestionably refers to "rights," with-

out shedding light on whether its intent was (or was not) to create privately enforceable rights." Maj. Op. at 12998. At the risk of sounding overly repetitive, all that *Gonzaga* requires to create a presumption of a remedy under § 1983 is that the statute confer an individual right, not a privately enforceable right. Thus, the fact that Secretary of State Rodgers understood Article 36(1)(b) to confer such rights is dispositive.

Further support for this conclusion is found in the U.S. Vienna Report, which was attached to the Letter of Submittal. The Report stated:

> The solution adopted by the Conference to the problem of adjusting the notification obligations of the receiving State to the *right of the individual* concerned to request notification lies in the final sentence of subparagraph 1(b). That sentence *requires authorities of the receiving State to inform the person detained of his right* to have the fact of his detention reported to the consular post concerned and of his right to communicate with that consular post.

The majority does not address these contemporaneous statements. Given that contemporaneous statements of the United States Department of State are entitled to "great weight" in the interpretation of treaties, the appropriate conclusion is that Article 36(1)(b) confers an individual right. *See* Maj. Op. at 12998 (citing *United States v. Stuart*, 489 U.S. 353, 369 (1989))

Finally, the majority relies on the legislative history of the Vienna Convention (the *travaux préparatoires*). After explaining that there is no need to resort to the *travaux préparatoires* because Article 36(1)(b) unambiguously does not confer "a right in individual detainees to support a cause of action under § 1983," the majority goes on to conclude that the *travaux préparatoires* is consistent with the State Depart-

ment's position. Maj. Op. at 12999. Specifically, the majority explains "there is no indication that States intended the enforcement of a 'right' to consular notification in the courts of the receiving State." *Id.* The reasoning again demonstrates the majority's confusion with the *Gonzaga* standard. *Gonzaga* only requires an intent in the Vienna Convention to create a right, not an intent to enforce a right.[2] Given this roundabout reliance on the *travaux préparatoires*, I believe it is important to show that it also supports the conclusion that Article 36(1)(b) confers an individual right.[3]

The original text of Article 36(1)(b) stated:

> The competent authorities shall, without undue delay, inform the competent consulate of the sending State, if within its district, a national of that State is committed to prison or to custody pending trial or is detained in any other manner. Any communications addressed to the consulate by the person in prison, custody or detention shall also be forwarded by the said authorities without undue delay . . . .

Draft ILC Articles, U.N. Doc. A/CN.4/136. As originally formulated, Article 36(1)(b) did not confer rights onto individu-

---

[2]For the same reason, the government's representation that "none of the 170 State parties has permitted a private tort suit for damages for violation of Article 36" is off the mark. The presumptive remedy for a violation of a treaty right is found in § 1983 of our domestic law not in the Vienna Convention. It is important to note that a suit under § 1983 is not a tort suit, instead it is a unique domestic remedy for violations under color of State law. *See* 42 U.S.C. § 1983. It is therefore not surprising that we are the only State that would permit private suits because we are likely the only State that has a § 1983 enforcement remedy or anything analogous to it.

[3]For a discussion generally in agreement with my conclusion that Article 36(1)(b) was intended by the drafter to confer individual rights on foreign nationals, see Mark J. Kadish, *Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Counsel*, 18 Mich. J. Int'l L. 565 (1997).

als. Instead, it imposed a state obligation to notify the consulate of the sending State when a national of the sending State was deprived of his liberty. The delegates to the Vienna Convention did not approve this version because of concerns about the burden on receiving States, particularly those with large tourist or immigrant populations to inform consular officials from the sending State in all cases.[4] *See* 1 Official Record, Twelfth Plenary Meeting at 42, ¶ 38 (April 20, 1963). Therefore, to lessen the burden, delegates sought and received approval of an amendment to Article 36(1)(b) that eliminated the automatic notification requirement and instead established an opt-in mechanism such that the detained foreign national had the right to request that consul be informed of his arrest or detention.[5] To ensure that the foreign national knew of this right, the delegate from the United Kingdom sought and received approval of an additional amendment that established the right of the detained foreign national to be informed of his right to request consul be notified of his decision.[6]

---

[4]For example, the delegates of New Zealand, the United Arab Republic, and the Federation of Malay each individually expressed concern with the burden of notification on the receiving States, particularly those States that received large numbers of immigrants and foreign tourists. 1 United Nations Conference on Consular Relations: Official Records of the Eleventh Plenary Meeting at 36, ¶ 9-10 (April 17, 1963).

[5]In particular, after a motion for reconsideration of Article 36(1)(b) passed, a proviso was proposed by a 17-state bloc to be added at the beginning of the text of Article 36(1)(b) stating, "unless [the foreign national] expressly opposes it, the competent authorities shall inform the competent consulate of the sending State." *Id*. at ¶ 54-55. The proviso had the purpose of "relieving the receiving State of the automatic duty to inform the consul of the arrest of the person concerned." *Id.* at ¶ 56. It also was included as recognition of the "need to take into consideration the prisoner's own freedom of choice." *Id.* In order to lessen the burden on State authorities, the delegate from the United Arab Republic proposed an amendment to replace the proviso "unless he expressly opposes it" with "if he so requests." *Id*. at ¶ 62. The delegate thus sought to transfer responsibility from the State to notify the consul to the individual to request notification.

[6]Specifically, the delegate from the United Kingdom was concerned that the proviso as originally stated ("unless he expressly opposes it") or as

On the basis of the evidence of the clear text of Article 36(1)(b), which specifies that it is the foreign national who has the right to be informed of the requirement that the detaining authorities must notify his consul if he so requests, it is clear that Article 36(1)(b) confers an individual right. Insofar as it is relevant, the language in the preamble of the Vienna Convention, the congressional intent of the ratifying Senate, the contemporaneous position of the United States Department of State and the *travaux préparatoires* does not undermine this interpretation. In fact, the contemporaneous position of the United States Department of State and the discussion of Article 36(1)(b) in the *travaux préparatoires* supports my conclusion that Article 36(1)(b) confers an individual right.

In sum, I believe that the confusion in the majority opinion ultimately arises from the erroneous interpretation of *Gonzaga*. Contrary to the majority's view that there must be an intent to confer a privately enforceable individual right, *Gonzaga* only requires a demonstration that the statute confers an individual right. *See Gonzaga*, 536 U.S. at 284 ("Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights."). As I will discuss below, the issue of whether the right is enforceable under § 1983 is addressed under a separate test.

---

proposed by the delegate of the United Arab Republic ("if he so requests") could give rise to abuses and misunderstandings. To address the potential for abuse, the delegate felt that "it was essential to introduce a provision to the effect that the authorities of the receiving State should inform the person concerned without delay of his rights under sub-paragraph (b)." *Id.* at ¶ 73. In other words, to ensure that the foreign national knew of his right to request that his consul be informed of his detention under Article 36(1)(b), he needed to be informed of his right to make the request. Article 36(1)(b) with the proviso, "if he so request" and the inclusion of the amendment suggested by the United Kingdom delegate ("The said authorities shall inform the person concerned without delay of his rights under this subparagraph"), which is the last sentence of Article 36(1)(b) as currently written, received a two-thirds vote.

## IV. Enforceability of Article 36(1)(b) Rights Under § 1983

The Supreme Court held in *Gonzaga*, "[o]nce a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Id.* at 284. This presumption can be defeated if Congress did not intend a remedy for the right. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005). Such congressional intent "may be found directly in the statute creating the right, or inferred from the statute's creation of a 'comprehensive enforcement scheme that is compatible with individual enforcement under § 1983' " or by the provision of a more restrictive express remedy in the statute itself. *Id.* at 120-21 (quoting *Blessing v. Freestone*, 520 U.S. 329, 341 (1997)). "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)).

The Vienna Convention is silent on private, judicially enforceable remedies for violation of individual rights. As such, the drafters did not express any intention to foreclose domestic remedies that would overcome the presumptive remedy under § 1983. The means of enforcement identified by the ratifying Senate, which included diplomatic channels and the Optional Protocol, are far from the "comprehensive enforcement scheme" that would be incompatible with individual enforcement under § 1983. Finally, the Vienna Convention does not include a more restrictive enforcement remedy that was intended to preclude enforcement under § 1983.

Thus, Article 36(1)(b) confers individual rights that are presumptively enforceable under § 1983. This presumption has not been defeated and therefore Article 36(1)(b) should be interpreted as conferring an individual right that is enforceable under § 1983. For these reasons, I respectfully dissent.