[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 22, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-16088

_____

D.C. Docket No. 06-00201-CV-2


HECTOR GANDARA,
a.k.a. Hector Gandarasegredo,

                                                        Plaintiff-Appellant,


versus



SHERIFF WAYNE BENNETT, Glynn County,
DOE, unknown investigator,
Glynn County Sheriff Office,
GARY MOORE, Glynn County District Attorney,


                                                        Defendants-Appellees.


_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(May 22, 2008)**

Before BIRCH and FAY, Circuit Judges, and RODGERS,[*] District Judge.

FAY, Circuit Judge:

The question presented in this matter is whether a foreigner who has been arrested and detained in this country and alleges a violation of the consular notification provisions of the Vienna Convention on Consular Relations (the "Treaty") can maintain an action under 42 U.S.C. § 1983. The answer to this question hinges on whether or not individual rights are bestowed by the Treaty. Although we find the issue a close one with strong arguments on both sides, we ultimately conclude the answer is "no."

Appellant, Hector Gandara ("Gandara") is a foreign national who was arrested and sentenced in state court for false imprisonment. He claims that while he was a detained foreign national, the Glynn County Detention Center officers ("Appellees") neither informed him of, nor provided him with, the right to consular notification under the Treaty. On appeal, Gandara argues that the district court erroneously dismissed his complaint contending that the Treaty grants him an individual right to seek civil damages in a United States federal court under 42 U.S.C. § 1983.

---

[*]Honorable M. Casey Rodgers, United States District Judge for the Northern District of Florida, sitting by designation.

## Factual Background

Gandara, an immigrant from Uruguay, entered the United States on a 90-day temporary visa. After his visa expired on June 22, 2002, he illegally remained in the country. On September 11, 2004, Gandara was arrested in Glynn County, Georgia and charged with false imprisonment. He pled guilty and was sentenced to five years in prison and five years of probation. Gandara claims that following his arrest and during the pendency of his criminal proceedings, the Appellees did not inform him of his right to contact the Uruguayan consulate and receive legal representation pursuant to Article 36 of the Treaty. Gandara also claims that Appellees subsequently denied his specific request that he be allowed to contact his consulate. As a result, Gandara asserts that these violations prevented him from obtaining needed consular assistance in order to notify family members in Uruguay of his arrest and solicit funds to obtain improved legal representation, facilitate his deportation to Uruguay instead of prosecution, and/or arrange for his sentence to be served in Uruguay rather than Georgia. Gandara sought a declaratory judgment, compensatory damages, and punitive damages for these alleged violations.

After an independent review of the record, the district court adopted the

Report and Recommendation of the U.S. Magistrate Judge, which recommended that Gandara's complaint be dismissed on the grounds that it failed to state a cognizable claim under § 1983 and analogized the relief sought by Gandara to that in a *habeas corpus* petition. Gandara filed an objection to the Report and Recommendation and argued, among other things, that the district court improperly relied on *Heck v. Humphrey*, 512 U.S. 477 (1994). He pointed out that he was not challenging his criminal conviction or his sentence, but was seeking civil damages and relief to remedy the violation of his Vienna Convention rights. We affirm the district court's judgment albeit for different reasons.

**Standard of Review**

We review a grant of a motion to dismiss for failure to state a claim *de novo*, "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1187 (11th Cir. 2004).

**Discussion**

We begin by noting that the district court improperly dismissed Gandara's complaint by relying on *Heck v. Humphrey* to decide that Gandara's civil

complaint on alleged violations of the Treaty was barred because his criminal conviction had not been set aside and a judgment in a § 1983 case could affect the validity of his conviction or sentence.[1]  Under the Supreme Court's ruling in *Sanchez-Llamas v. Oregon*, 126 S.Ct. 2669 (2006), a violation of the Vienna Convention's Article 36 does not necessarily require reversal of a criminal conviction or sentence.  Thus, in our opinion, *Heck* does not bar the claim being made here.  Gandara is not attacking the validity of his criminal conviction or sentence, but rather pursuing a civil claim for money damages and other civil remedies.  There is no legal inconsistency.

This Circuit has not expressly addressed the issue of whether the Vienna Convention contains private rights and remedies enforceable in our courts through § 1983 by individual foreign nationals who are arrested or detained in this country. We have previously commented, however, on the issue of private rights in the context of criminal cases and indicated that we would follow the lead of the First and Ninth Circuits.  *See United States v. Cordoba-Mosquera*, 212 F.3d 1194, 1196 (11th Cir. 2000) (the First and Ninths circuits have indicated that Article 36 does

---

[1] Under *Heck*, to recover damages for harm caused by actions whose unlawfulness would make a conviction or sentence invalid, a plaintiff under 42 U.S.C. § 1983 must prove that the conviction or sentence "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determinations, or called into question by a federal court's issuance of a writ of habeas corpus."  *Heck*, 512 U.S. at 486-87.

not create privately enforceable rights).  Today, for practical and judicial economy reasons, we are going to decide the specific issue presented.[2]

A reading of the text of the Treaty suggests that the scenario established would include several steps: (1) Upon arrest and detention, the foreign national would be advised of the notification procedures established and available, (2) The individual would be asked whether or not he/she desires notification to be given to the consular post of his/her state, and (3) Depending upon the decision made by the individual, notice would be given or no action taken.

All who have dealt with this issue recognize the language of the Treaty's preamble, which states that "the purpose of such privileges and immunities [created by the Treaty] is not to benefit individuals . . . ." Vienna Convention on Consular Relations, pmbl.  In spite of this provision, those who find that there are individual rights turn to Article 36, which reads:

> *[I]f he so requests*, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any

---

[2] Alternatively, we could simply find that *Heck* is inapplicable and remand the case to the district court.

other manner.  Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this subparagraph.

Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261, art. 36(1)(b) (emphasis added).  The Seventh Circuit in *Jogi v. Voges*, 480 F.3d 822 (7th Cir. 2007), concluded that Article 36 is worded in a way to guarantee that the right conferred by Article 36 belongs to the individual and not the respective governments.  That court reasoned that "[i]t is a mistake to allow general language of a preamble to create an ambiguity in specific statutory or treaty text where none exists.  Courts should look to materials like preambles and titles only if the text of the instrument is ambiguous." *Id.* at 834.  That court concluded that once a plaintiff has demonstrated that a treaty confers an individual right, then the right is presumptively enforceable by § 1983. *See id.* at 835; *Gonzaga University v. Doe*, 536 U.S. 273, 284 (2002).

The dissenting opinion in *Cornejo v. County of San Diego*, 504 F.3d 853, 872 (9th Cir. 2007) also follows this reasoning, by stating that:

[I]t is clear that Article 36(1)(b) confers an individual right. Insofar as it is relevant, the language in the preamble of the Vienna Convention, the congressional intent of the ratifying Senate, the contemporaneous position of the United States Department of State and the *travaux préparatoires* do not undermine this interpretation. In fact, the contemporaneous position of the United States Department of State and the discussion of Article 36(1)(b) in the *travaux préparatoires* supports my conclusion that Article 36(1)(b) confers an individual right.

This dissent, like *Jogi*, urges that these individual rights are presumptively enforceable under § 1983.

While the above arguments in favor of individual rights under the Treaty are impressive, we do not follow them for the following reasons.

First, the "context" of a treaty includes its preamble, Vienna Convention on the Law of Treaties art. 31(2), May 23, 1969, 1155 U.N.T.S. 331, and we rely on it to provide context for the terms of Article 36(1)(b) because "a treaty must be interpreted as a whole in light of its object and purpose, including the preamble." *Cornejo*, 504 F.3d at 861 n. 13 (citing Vienna Convention on the Law of Treaties

art. 31(2); Restatement (Third) of Foreign Relations Law § 325(1) (1987)).  The preamble to the Vienna Convention is clear that the drafters did not intend to create individual rights.  It states that the signatories "[r]ealiz[ed] that the purpose of such privileges and immunities [created by the Treaty] is *not to benefit individuals* but to ensure the efficient performance of functions by consular posts on behalf of their respective States." Vienna Convention on Consular Relations, pmbl. (emphasis added).  Indeed, this language has led this court to conclude that "the Vienna Convention itself disclaims any intent to create individual rights[.]" *United States v. Duarte-Acero*, 296 F.3d 1277, 1281-82 (11th Cir. 2002); *see also Maharaj v. Sec'y for the Dep't of Corr.*, 432 F.3d 1292, 1307 (11th Cir. 2005) (containing clear language that the Convention did not create individual rights); *United States v. Rodriguez*, 162 Fed. Appx. 853, 857 (11th Cir. 2006) (relying on *Duarte-Acero* and concluding that "[t]he Vienna Convention does not confer judicially enforceable *individual rights*").

Second, we find the majority opinion in *Cornejo* very persuasive.  As stated there:

Article 36 does not create judicially enforceable rights.  Article 36 confers legal rights and obligations on *States* in order to facilitate and promote consular functions.  Consular functions include protecting

9

the interests of detained nationals, and for that purpose detainees have the right (if they want) for the consular post to be notified of their situation. In this sense, detained foreign nationals benefit from Article 36's provisions. But the right to protect nationals belongs to *States* party to the Convention; no private right is unambiguously conferred on individual detainees such that they may pursue it through § 1983.

*Cornejo*, 504 F.3d at 855. *Cornejo* further emphasizes that "[f]or any treaty to be susceptible to judicial enforcement it must both confer individual rights and be self-executing." *Id*. at 856. The Vienna Convention is self-executing because it has the force of domestic law without Congress having to implement legislation. However, "all self-executing treaties do not necessarily provide for the availability of such private actions." *Id.* at 857 (quoting *Renkel v. United States*, 456 F.3d 640, 643 n.3 (6th Cir. 2006)).

Even though treaties may accord enforceable individual rights, most courts accept a "presumption" against inferring such rights from international treaties. Thus, the general rule is that "[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a

private cause of action in domestic courts, but there are exceptions with respect to both rights and remedies." *Cornejo*, 504 F.3d at 859 (quoting Restatement (Third) of Foreign Relations Law § 907 cmt. a (1987)). Furthermore, the use of the word "rights" in paragraph 1(b) "arguably confers on an individual the right to consular assistance following arrest." *Breard v. Greene*, 523 U.S. 371, 376 (1998). But paragraph 1(b), does not address the nature of "his rights" or how, if at all, they may be invoked. Therefore, this language must be considered in light of the purpose of the Treaty and Article 36. *See Cornejo*, 504 F.3d at 859 (citing Restatement (Third) of Foreign Relations Law § 325(1) and noting that treaty terms are to be construed in their context and in the light of the treaty's object and purpose). Hence, the "rights" conferred under Article 36 are meant to facilitate the exercise of consular functions. We agree with the majority opinion of the Ninth Circuit, which summarizes very well the position that the Treaty simply fails to confer individual rights that may be judicially enforced.

Third, the Vienna Convention does not expressly provide for private damage actions. Instead, "the plain words of the Treaty provide that the notification right 'shall be exercised,' not that failure to notify should be compensated." *Cornejo*, 504 F.3d at 861 n. 14. Therefore, we conclude that the Treaty does not contemplate private damage actions, "and it would not be sound

judicial policy to conjure legal theory that would expose individual officers to liability for breaches of international treaties." *Id.*

Moreover, the position of the United States Department of State, which is entitled to "great weight," also reinforces this view.[3] The Department of State has repeatedly affirmed that "the only remedies for failures of consular notification under the Vienna Convention are diplomatic, political, or exist between the states under international law . . . [t]he right of an individual to communicate with his consular official is derivative of the sending state's right to extend consular protection to its nationals[.]" *Cornejo*, 504 F.3d at 862 (quoting *U.S. v. Li*, 206 F.3d 56, 63 (1st Cir. 2000)).

In addition, the *travaux préparatoires* of the Vienna Convention supports the State Department's position: "[T]here is no indication that States intended the enforcement of a 'right' to consular notification in the courts of the receiving State." *Cornejo*, 504 F.3d at 863. Even if the *travaux préparatoires* were susceptible to different interpretations, it would be imprudent under domestic law

---

[3] *See United States v. Stuart*, 489 U.S. 353, 369 (1989) ("meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight").

to create a privately enforceable right that is not explicitly found in the text.[4]

And lastly, but certainly not least, is our court's prior panel rule. This rule is simply that "we are bound by the holdings of earlier panels unless and until they are clearly overruled *en banc* or by the Supreme Court." *Swann v. S. Health Partners, Inc.*, 388 F.3d 834, 837 (11th Cir. 2004). Our earlier panels were dealing with criminal cases and not claims under § 1983. However, from those opinions, the announced rule is that the Vienna Convention does not confer enforceable individual rights. Although the issues in our earlier cases differed somewhat, the analysis is exactly the same. That is the law of our circuit.[5]

## Conclusion

For these reasons, we affirm the judgment of the district court.

AFFIRMED.

---

[4] Domestic law controls the exercise of rights pursuant to paragraph 2 of Article 36. *See Cornejo*, 504 F.3d at 863.

[5] We note that several district courts in our circuit have followed the lead of the Ninth Circuit. *See Gardner v. Meggs*, 2007 WL 3231734 (N.D. Fla., 2007) (following majority of districts and holding that Article 36 does not create an individual right enforceable by plaintiff where plaintiff alleges violation of civil rights by defendant's failure to advise him of his rights or acknowledge his status as a foreign national); *Lopez v. Wallace*, 2007 WL 2080307 (N.D. Ga., 2007) (holding that plaintiff has no "judicially enforceable" right to consular assistance under the VCCR even though plaintiff states that he was convicted and received his sentence without having an opportunity to contact the Colombian Consulate). This district court judgment in *Lopez* was affirmed in part, vacated and remanded in part without reaching the question at issue. 2008 WL 485416 (11th Cir. 2008). Although *Medellin v. Texas*, 128 S.Ct. 1346 (2008) (Medellin II) dealt with closely related questions, the Court specifically stated that it was not resolving "whether the Vienna Convention is itself 'self-executing' or whether it grants Medellin individually enforceable rights." *Id.* at n.4.

RODGERS, District Judge, specially concurring:

I concur in the result reached by the majority because I agree we are bound by prior panel decisions that have concluded the Vienna Convention on Consular Relations ("the Convention") does not confer individually enforceable rights on detained foreign nationals.[1]  I write separately because the majority and *Cornejo v. County of San Diego*, 504 F.3d 853 (9th Cir. 2007)*,* the decision on which the majority so heavily relies, address many – but, in my view, not all – aspects of the complex issues presented in this case, several of which are the subject of considerable scholarly debate among jurists and commentators.[2]  I write also to

[1]As the majority notes in discussing the prior panel rule, the Eleventh Circuit cases finding the Convention does not grant private rights arose in the criminal context, not under 42 U.S.C. § 1983 (or, as Gandara also asserts in his complaint, under the Alien Tort Statute, 28 U.S.C. § 1350).  Although there are obvious differences between the issues presented in the prior criminal cases and this civil one, in both types of cases the analysis for finding a private right is the same.  Accordingly, as the majority recognizes, the law of this circuit is that the Convention does not confer individual rights that may be enforced through § 1983 (or § 1350).

[2] *See*, *e.g., Medellín v. Texas*, 552 U.S. ____, 128 S.Ct.1346, ____ L.Ed.2d ____ (2008) ("*Medellín II*") (Stevens, J., concurring) (Breyer, J., dissenting, joined by Souter and Ginsburg, JJ.); *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006) (Ginsburg, J., concurring) (Breyer, J., dissenting, joined by Stevens and Souter, JJ., and Ginsburg, J., in part)*; Medellín v. Dretke,* 544 U.S. 660, 125 S.Ct. 2088, 161 L. Ed. 2d 982 (2005) ("*Medellín I*") (Ginsburg, J., concurring, joined by Scalia, J., in part) (O'Connor, J., dissenting, joined by Stevens, Souter, and Breyer, JJ.)*; Mora v. People of the State of New York,* ___ F.3d ____, 2008 WL 1820836 (2d Cir. 2008); *Cornejo v. County of San Diego*, 504 F.3d 853 (9th Cir. 2007) (Nelson, J., dissenting); *Jogi v. Voges*, 480 F.3d 822 (7th Cir. 2007); *United States v. Li*, 206 F.3d 56 (1st Cir. 2000) (*en banc*) (Torruella, C.J., concurring in part and dissenting in part). *See also*, *e.g.,* Tim Wu, *Treaties' Domains*, 93 Va. L. Rev. 571 (2007); Aya Gruber, *Who's Afraid of Geneva Law?*, 39 Ariz. St. L.J. 1017 (2007); John Quigley, *Toward More Effective Judicial Implementation of Treaty-Based Rights*, 29 Fordham Int'l L.J. 552

explain my concern over elements of the rationale relied on by the majority and

*Cornejo*, primarily pertaining to interpretation of the Convention's text, to

conclude that Article 36 does not confer judicially enforceable individual rights.

An issue of threshold importance in this case (or any case that requires a

court to consider whether a treaty's provisions may be subject to judicial

enforcement) is whether the treaty is self-executing.  *See Cornejo*, 504 F.3d at 856

(stating that "[f]or any treaty to be susceptible to judicial enforcement it must *both*

confer individual rights and be self-executing.") (emphasis added).  Briefly stated,

a self-executing treaty is one that has "automatic domestic effect as federal law

upon ratification."  *Medellín II*, 128 S.Ct. at 1356 n. 2.  It is "immediately and

directly binding on state and federal courts pursuant to the Supremacy Clause."

*Id.* at 1360.  "Conversely, a 'non-self-executing' treaty does not by itself give rise

to domestically enforceable federal law.  Whether such a treaty has domestic effect

depends upon implementing legislation passed by Congress."[3]  *Id.* at 1356 n. 2.

---

(2006); David Sloss*, When Do Treaties Create Individually Enforceable Rights? The Supreme Court Ducks the Issue in Hamdan and Sanchez-Llamas,* 45 Colum. J. Transnat'l L. 20 (2006); Mark J. Kadish, *Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Consul*, 18 Mich. J. Int'l L. 565 (1997); Carlos Manuel Vázquez, *The Four Doctrines of Self-Executing Treaties*, 89 Am. J. Int'l L. 695 (1995).

[3]  In other words, a self-executing treaty is one that operates of itself without the aid of any legislative provision. *Foster v. Neilson*, 27 U.S. 253, 314, 2 Pet. 253, 7 L.Ed. 415 (1829). As the Supreme Court has explained,

Accordingly, even if Article 36 gives rise to individual rights, if the Convention is not self-executing and does not have implementing legislation enacted by Congress a plaintiff cannot enforce those rights under our domestic law.

As far as I am aware, the lower courts that have addressed the question of whether Article 36 grants individually enforceable rights, including the majority in this case and *Cornejo*, have concluded that the Convention is self-executing. *See ante,* at 9; *Cornejo*, 504 F.3d at 855. *See also Jogi*, 480 F.3d at 830 (accepting the parties' undisputed representations that the Convention is self-executing); *Breard v. Pruett*, 134 F.3d 615, 622 (4th Cir. 1998) (Butzner, S.J., concurring) (stating that "[t]he Vienna Convention is a self-executing treaty – it provides rights to individuals rather than merely setting out the obligations of signatories."); *Faulder v. Johnson*, 81 F.3d 515, 520 (5th Cir. 1996) (assuming the same). *See also*

---

A [self-executing] treaty, then, is a law of the land as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.

*Head Money Cases*, 112 U.S. 580, 598-99, 5 S.Ct. 247, 28 L.Ed. 798 (1884). A self-executing treaty's provisions are redressable through the courts. *See id.*; *Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed.386 (1888); *Foste*r, 27 U.S. at 314.

In contrast, a non-self-executing treaty is in the nature of a contract between nations; it does not stand alone as law. Its provisions can only be enforced pursuant to legislation designed to implement the treaty's provisions. It is enforced by the government of the respective parties to the instrument through diplomatic and political means. *See Whitney*, 124 U.S. at 194; *Foste*r, 27 U.S. at 314.

*Sanchez-Llamas*, 126 S.Ct. at 2694 (Breyer, J., dissenting, joined by Stevens, Souter, and Ginsburg, JJ.) (stating "it is common ground that the Convention is self-executing."); *see also Mora,* 2008 WL 1820836, *5 n.16 (finding it unnecessary to decide the question.). Unfortunately, these courts have assumed or held that the Convention is self-executing with little or no analysis of the treaty's text.[4]

Recently, the Supreme Court expressly noted, albeit with virtually no discussion, that it has not yet decided whether the Vienna Convention is self-executing. *See Medellín II*, 128 S.Ct. at 1357 n. 4 (stating that because the question before the Court was whether an International Court of Justice ("ICJ") decision was binding on United States courts under the Optional Protocol, ICJ Statute, and the United Nations Charter, it was "unnecessary to resolve whether the Vienna Convention is itself 'self-executing' or whether it grants Medellín individually enforceable rights."). Even so, in discussing the approach to be taken in analyzing international agreements, the Court stressed that for a treaty to be

---

[4] Instead, most courts have simply referenced the statements of the Executive Branch made at the time the Convention was ratified that the Convention is self-executing. *See* S. Exec. Rep. No. 91-9 (1969). *See also* Report of the United States Delegation to the United Nations Conference on Consular Relations, Vienna, Austria, March 4 to April 22, 1963.

self-executing such status must be obvious from the treaty's terms.[5] *Medellín II*, 128 S.Ct. at 1369 (stating that "[i]f the Executive determines that a treaty should have domestic effect of its own force, that determination may be implemented 'in mak[ing]' the treaty, by ensuring that it contains language *plainly* providing for domestic enforceability.") (emphasis added). As the Court further explained, it is only by committing to an interpretive, textual approach that the courts can be certain they are enforcing a treaty that the President – through negotiating it – and the Senate – through ratifying it – intended to be enforceable as domestic law. *Id.* at 1361-63. This self-executing certainty must exist if the separation of powers doctrine is to be honored. *Id*. at 1369.

Given the Court's guidance in *Medellín II*, it seems likely that future analyses by the lower courts of the still-open question of whether the Vienna Convention is self-executing will involve closer scrutiny of the treaty's text than it has been accorded in the past. I would anticipate that the analysis of the self-execution question, an arduous enough task in itself, will be a particularly difficult

---

[5] In conducting its analysis in *Medellín II* as to whether the Optional Protocol, ICJ Statute, and the United Nations Charter were self-executing, the Court looked carefully at their texts, searching for some indication that the signatory States intended the agreements to have domestic effect upon ratification. Additionally, although it primarily relied on the text in finding that an ICJ judgment did not of its own force constitute binding federal law, the Court also considered the treaties' background, negotiating and drafting history, and the practice among signatory nations in reaching that conclusion. *See Medellín II*, 128 S.Ct. at 1367.

and murky exercise in cases such as this that entail the distinct but related question of whether the Convention grants individually enforceable rights.[6] *See Medellín I*, 544 U.S. at 687 (O'Connor, J., dissenting) (noting that the questions of whether a treaty is self-executing and whether it grants individually enforceable rights are "analytically distinct."). In light of this circuit's prior panel decisions and the fact that the parties in this case have not raised self-execution as an issue, the question is beyond the scope of this special concurrence. I therefore need not and do not venture into that analytical thicket. Nonetheless, I submit that to avoid confusion and perhaps faulty analysis on the private rights question, courts should be careful to recognize that when finding a treaty provision "self-executing" they are in effect declaring the provision judicially enforceable and thus discharging any concern for the separation of powers.[7]

Another central issue in this case involves the presumption in treaty cases –

---

[6] I should make clear that when speaking of self-execution in this respect I am referring to judicial redress of the Convention's provisions in the courts of this country, as opposed to the individual state authorities' obligation to comply with the treaty's provisions in the absence of implementing legislation.

[7] Some courts have rejected the notion of individual rights in Article 36 based on such concerns. *See Mora*, 2008 WL 1820836, *11. While the Constitution's separation of powers is undoubtedly a factor in the decision of whether a treaty's provisions are self-executing, *see Medellín II*, 128 S.Ct. at 1369, the same degree of judicial restraint is not required on the issue of individual rights because presumably at that stage of the analysis the treaty has been declared self-executing (or assumed to be so), which contemplates judicial enforcement of the treaty's provisions.

followed by the majority here and many other courts, including *Cornejo* – that

"[i]nternational agreements, even those directly benefiting private persons,

generally do not create private rights or provide for a private cause of action in

domestic courts." *Cornejo*, 504 F.3d at 859 (citing 2 Restatement (Third) of

Foreign Relations Law of the United States ("Restatement") § 907, Comment a, p.

395 (1986)); *ante,* at 9. Although I acknowledge the sound political and

diplomatic reasons for applying a presumption that treaties generally do not create

private rights, I nevertheless have concerns about application of the presumption

to Article 36(1)(b).[8]

First, it is commonly accepted that there are exceptions to the presumption

with respect to both rights and remedies. *Cornejo*, 504 F.3d at 859 (citing

Restatement § 907, Comment a). Indeed, on many occasions in the past the

Supreme Court has recognized that treaties may provide individual rights. *See*

*Medellín I,* 125 S.Ct. at 2103 (O'Connor, J., dissenting) (recognizing the Supreme

---

[8] It should be noted that the validity of the presumption has been questioned. *See, e.g., Sanchez-Llamas*, 126 S.Ct. at 2697 (Breyer, J., dissenting) (insisting that "no such presumption exists."). Additionally, some might find the presumption difficult to reconcile with the longstanding rule of treaty interpretation that holds where a treaty admits of two constructions, one restrictive of rights and the other favorable to them, the latter is preferred. *See*, *e.g., United States v. Stuart*, 489 U.S. 353, 368, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989)*; Asakura v. Seattle*, 265 U.S. 332, 342, 44 S.Ct. 515, 68 L. Ed. 1041 (1924); *De Geofroy v. Riggs*, 133 U.S. 258, 268, 10 S.Ct. 295, 33 L.Ed. 642 (1890).

Court has "repeatedly enforced treaty-based rights of individual foreigners,

allowing them to assert claims arising from various treaties.") (citing *Asakura*, 265

U.S. at 340, and *Kolovrat v. Oregon*, 366 U.S. 187, 191-92 n. 6, 196, 81 S.Ct. 922,

6 L. Ed. 2d 218 (1961)).  *See also United States v. Alvarez-Machain*, 504 U.S.

655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992); *Clark v. Allen*, 331 U.S. 503, 67

S.Ct. 1431, 91 L.Ed. 1633 (1947); *United States v. Rauscher*, 119 U.S. 407, 7

S.Ct. 234, 30 L.Ed. 425 (1886); *Head Money Cases*, 112 U.S. at 598.  Moreover,

this precedent (and thus support for the existence of and exception to the

presumption) has long been a part of our jurisprudence, having originated in the

venerable *Head Money Cases*:

> A treaty is primarily a compact between independent nations.  It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it.  If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war.  It is obvious that with all this the judicial courts have nothing to do and can give no redress.  *But a treaty may also contain provisions which confer rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country.  . . .*  The constitution of the United States places such provisions as these in the same category as other laws of congress by its declaration that 'this constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land.'  *A treaty, then, is a law of the land as an act*

21

*of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.*

*Head Money Cases*, 112 U.S. at 598 (emphases added); *see also* Restatement § 907 ("A private person having rights against the United States under an international agreement may assert those rights in courts in the United States of appropriate jurisdiction either by way of claim or defense.")).

Despite the precedent cited above in which the Supreme Court readily found treaty-based individually enforceable rights, many appellate courts have declined to do the same. Instead, those courts have stringently applied the presumption that treaties generally do not create individually enforceable rights and required express language indicating a contrary intent in order to overcome the presumption. *See Medellín II*, 128 S.Ct. at 1357 n.3 (commenting that "a number of the Courts of Appeals have presumed that treaties do not create privately enforceable rights in the absence of express language to the contrary.") (citing *United States v. Emuegbunam*, 268 F.3d 377, 389 (6th Cir. 2001); *United States v. Jimenez-Nava*, 243 F.3d 192, 195 (5th Cir. 2001); *United States v. Li*, 206 F.3d 56, 60-61 (1st Cir. 2000) (*en banc*); *Goldstar (Panama) S.A. v. United States*, 967

22

F.2d 965, 968 (4th Cir. 1992); *Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1298 (3rd Cir. 1979)); *see also Mora*, 2008 WL 1820836, *11. *Cornejo* and the majority in this case have done the same. *Cornejo*, 504 F.3d at 859; *ante*, at 9.

That the presumption against finding individual rights in treaties is generally (and conveniently) applicable makes the frequent reliance on it by courts in Article 36 cases understandable. Less understandable is the requirement imposed by many courts that the treaty contain concrete and specific enforcement language in order to find individual rights. While we know from *Medellín II* that the *sine qua non* of treaty interpretation is the treaty's text, *see Medellín II*, 128 S.Ct. at 1365 n.11 (stating that "the terms of a treaty govern its enforcement"), that case also tells us that insofar as self-execution is concerned it is not required "that a treaty provide for self-execution in so many talismanic words." *Medellín II*, 128 S.Ct. at 1366. Moreover, as Justice O'Connor has pointed out, in analyzing the issue of individual rights the Court has read treaties with similar lenience. *See Medellín I*, 125 S.Ct. at 2103 (O'Connor, J., dissenting) (citing cases and stating that the treaties in which individually enforceable rights were found "do not share any special magic words. Their rights-conferring language is arguably no clearer

23

than the Vienna Convention's is, and they do not specify judicial enforcement.").

I recognize and agree that treaty interpretation demands a highly textual approach. In my view, however, that approach cannot be so hyper-exacting as to require specific terminology or phrasing in order to find that a treaty creates enforceable individual rights when from the plain language of the text it is clear that a right is conveyed. As I see it, the majority in this case – as well as *Cornejo* and *Mora* – have undertaken an overly demanding search of the text that incorrectly focuses on the absence of specific enforcement language as clear evidence that the signatory states did not intend to create such rights in Article 36.[9] It seems to me the proper textual approach instead calls for a plain interpretation of the specific obligation in question.[10]

---

[9] While *Cornejo* acknowledges the textual reference to "his rights" provides a compelling argument in favor of individual rights, *Cornejo*, 504 F.3d at 859, it nonetheless rejects that argument because the text "says nothing about the nature of 'his rights' or *how, if at all, they may be invoked*." *Id*. (emphasis added). The majority shares the same concern. *Ante, at 9.* Additionally, although *Mora* does address the specific obligations in Article 36(1)(b), the court decides that the obligation to notify a foreign detainee of his rights is not an enforceable right because the text does not correspondingly refer to the obligation as a "right" of the individual. *Mora*, 2008 WL 1820836, *6. Consistent with *Cornejo* and the majority, *Mora* also expresses concern for the lack of enforcement language in Article 36. *See id.* ("Nevertheless, we think that the lack of any mention in the text of Article 36(1)(b) as to whether or how detained foreign nationals might vindicate their asserted rights at least suggests that the drafters did not intend to confer rights directly upon individuals.").

[10] Looking at the obligation, the court should decide whether by the text's language the drafters intended to require receiving States to take action exclusively directed towards foreign detainees which is of a nature to be enforced by the courts of this country and to which our courts could look for a rule of decision. *See Medellín I*, 125 S.Ct. at 2103 (O'Connor, J., dissenting)

24

Article 36(1)(b) imposes three obligations on receiving States: (1) inform the consul of a foreign national's arrest or detention, if the national so requests; (2) forward communications from a detained national to the consulate without delay; and (3) inform the detained national of *his rights* under Article 36(1)(b) without delay.[11] Vienna Convention on Consular Relations, art. 36(1)(b) (emphasis added). The third of these obligations, paragraph (1)(b)(3), is the primary focus in this case.[12]

Paragraph (1)(b)(3) *obligates* the receiving State to "inform the person concerned without delay of *his rights* under this sub-paragraph." Vienna Convention on Consular Relations, art. 36(1)(b) (emphasis added). Undoubtedly, as the majority and *Cornejo* recognize, this obligation serves to facilitate consular functions. But it is equally apparent that this language goes further and secures a separate entitlement for the benefit of the foreign national only, *i.e.,* the right to be informed without delay of *his rights* under the Convention. *See Medellín I*, 544

---

(quoting *Head Money Cases*, 112 U.S. at 598-99).

[11] Although the Convention itself does not do so, for discussion purposes I identify these three obligations as subparts of Article 36(1)(b) (*i.e.*, paragraph (1)(b)(1), (1)(b)(2), and (1)(b)(3).

[12] Gandara complains that he was not notified of his Article 36(1)(b) rights at the time of his arrest, in violation of Article 36(1)(b)(3). He also complains that later, after learning from another source that he had the right to contact his consul, prison officials refused his request to do so, in violation of Article 36(1)(b)(1).

25

U.S. at 687 (O'Connor, J., dissenting) (stating that "[i]f Article 36(1)(b) imposed only two obligations on signatory countries – to notify the consul and forward correspondence – then Medellín could not invoke the treaty as a source of personal rights by virtue of its self-executing character. But the treaty goes further – imposing an obligation to inform the individual of his rights in the treaty."). The exclusive focus of the obligation expressed in Article 36(1)(b)(3) is on foreign detainees; this in turn entitles them to be informed of the availability of consular notification, independent of any rights of the consulate.[13] *See Breard*, 523 U.S. at 376 *(*noting that Article 36 *arguably* confers enforceable individual rights); *see also Medellín I*, 544 U.S. at 687(O'Connor, J., dissenting) (explaining that "[i]f article 36 conferred no rights on the detained individual, its command to 'inform' the detainee of 'his rights' might be meaningless."); *see also Pielage v. McConnell*, 516 F.3d 1282, 1288 (11th Cir. 2008) (noting that "[t]reaties, like statutes, should be construed so that no words are treated as being meaningless, redundant, or mere surplusage.") (citation omitted). As such, Article 36(1)(b)(3) treats detained foreign nationals as far more than merely intended beneficiaries;

---

[13] *Mora* disagrees. *Mora*, 2008 WL 1820836, *6. It considers the absence of a specific reference to the word "right" fatal to finding an individually enforceable right in Article 36. As stated above, in my view the obligation's focus is what gives rise to the right without the need for a hyper-exacting word search of the text for what is otherwise obvious from its face.

rather, its unmistakable focus is on the detained foreign nationals themselves and their right to be informed.[14] To require more specific language in the face of such clarity, I believe, is unwarranted under ordinary principles of treaty interpretation. *See id*. Moreover, by its nature, the Article 36(1)(b)(3) obligation is one that can readily be enforced by a court. *See id*. (stating that "if a statute were to provide, for example, that arresting authorities 'shall inform a detained person without delay of his right to counsel,' I question whether more would be required before a defendant could invoke that statute to complain in court if he had not been so informed.")[15]

---

[14] I question precisely how foreign detainees would be beneficiaries of the obligation imposed by Article 36(1)(b)(3) as this provision makes no mention whatsoever of the consulate. The obligations in Article 36(1)(b)(1) and (2), on the other hand, directly implicate benefits accruing to the consulate; concededly, detainees are merely the intended beneficiaries of these obligations. Indeed, I view these two provisions as good examples of obligations that are self-executing in the sense that they are fully executed obligations of the receiving States, with which those States must comply at the risk of political consequences; they do not, however, create private rights enforceable by individuals in our courts. *See Medellín* I, 544 U.S. at 687 (O'Connor, J., dissenting).

[15] The view that the text of Article 36(1)(b) undeniably conveys an individually enforceable right on detained foreign nationals is shared by many. *See Sanchez-Llamas*, 126 S.Ct. at 2691 (Breyer, J., dissenting, joined by Stevens, Souter, and Ginsburg, JJ.) (taking the position that Article 36 gives rise to judicially enforceable individual rights); *Medellín I*, 544 U.S. at 687 (O'Connor, J., dissenting); *Jogi*, 480 F.3d at 833 (stating that "[i]n our view, this text satisfies the strict test of clarity that the Supreme Court set forth in *Gonzaga University*"); *Cornejo*, 504 F.3d at 872 (Nelson, J., dissenting) (stating that "[i]t is clear that Article 36(1)(b) confers an individual right."); *Li*, 206 F.3d at 72 (Torruella, C.J., concurring in part, dissenting in part) (stating that "I have some difficulty envisioning how it is possible to frame language that more unequivocally establishes that the protections of Article 36(1)(b) belong to the individual national, and that the failure to promptly notify him/her of these rights constitutes a violation of these entitlements by the detaining authority.").

Despite the unambiguous language of Article 36(1)(b)(3), *Cornejo* finds the text to be less than clear on the subject of individual rights because it "says nothing about the nature of 'his rights' or how, if at all, they may be invoked." *See Cornejo*, 504 F.3d at 859. The court reasons that "[t]his language, therefore, must be considered in light of what the Convention, and Article 36, are all about." *Id.; see also ante*, at 10. The court then turns to the Convention's context and history and determines that it clearly contains no individually enforceable rights.[16]

I have no objection to *Cornejo's* resort to the Convention's preamble and Article 36's purpose statement for context. *See* Vienna Convention on the Law of Treaties art. 31, May 23, 1969, 1155 U.N.T.S. 33 (noting that the "context" of a treaty includes its preamble)). Nonetheless, I am concerned with the weight accorded to these provisions in light of the plainness of the text.[17] First, an

---

[16] As *Cornejo* states, in many respects treaties "come with their own rules of the road." *Cornejo,* 504 F.3d at 858 n.9. I recognize that treaties are to be interpreted "in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose." Restatement § 325(1). Also, I do not question that a treaty's negotiation and drafting history as well as "'the postratification understanding'"of signatory nations may be considered as "'aids to its interpretation.'" *Medellín II*, 128 S.Ct. at 1357 (citations omitted). As previously noted, however, the *sine qua non* of treaty interpretation is the treaty's text. *See Medellín II*, 128 S.Ct. at 1365 n. 11.

[17] Many courts, including other Eleventh Circuit panels, have relied in large part on the Convention's preamble to conclude that Article 36 does not confer enforceable individual rights. *See, e.g., United States v. Duarte-Acero*, 296 F.3d 1277, 1281-82 (11th Cir. 2002); *Maharaj v. Sec'y for the Dep't of Corr.*, 432 F.3d 1292, 1307 (11th Cir. 2005); *United States v. Jimenez-Nava*, 243 F.3d at 197*; United States v. Emuegbunam*, 268 F.3d at 392*.*

28

interpretation of the preamble as providing *clear* indication that Article 36(1)(b) does not give rise to individual rights for detained foreign nationals gives reason for pause.  Paragraph four of the preamble provides that the signatory States agree to the terms of the Convention "[r]ealizing that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States."  Vienna Convention on Consular Relations, pmbl.  Reading this language in isolation leaves little doubt that the Convention was not intended to bestow "privileges and immunities" on individuals.  There is more to the preamble on this point, however, and any interpretation that begins and ends with paragraph four is incomplete. The preamble first speaks of privileges and immunities in paragraph three, which states that the signatories agree to the terms of the Convention "[b]elieving that an international convention on *consular* relations, privileges and immunities would also contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems."  *Id.* (emphasis added).  The term "privileges and immunities" in paragraph three is modified by the adjective "consular," thus clearly identifying the "privileges and immunities" being described; the term "*such* privileges and immunities" in paragraph four refers back to those previously mentioned in paragraph three.  Thus "consular" in

paragraph three also modifies the "consular privileges and immunities" referenced in paragraph four. Accordingly, reading paragraphs three and four of the preamble in conjunction, as I believe they must be read in order to understand whose privileges and immunities are being referenced, I understand the "privileges and immunities" limitation in paragraph four to pertain strictly to consular officials and staff. This construction makes the most sense considering that the preamble contains no explicit or implicit reference to non-consulate individuals, such as detained foreign nationals, nor does it mention "rights." Thus, I believe the preamble can be fairly read as simply reflecting the drafters' intent not to extend certain privileges and immunities to consular staff individually,[18] leaving the matter of individual rights for detained foreign nationals unaddressed.

*Cornejo* also relies on the purpose statement of Article 36(1) as "unmistakable" evidence that the rights in Article 36(1)(b) are solely meant "to facilitate the exercise of consular functions relating to foreign nationals of the sending State." *Cornejo*, 504 F.3d at 860. Further, *Cornejo* reasons that because

---

[18] The Report of the United States Delegation to the United Nations Conference on Consular Relations is consistent with this understanding. It notes that the Convention "rest[s] upon the premise that privileges and immunities are granted for governmental reasons, rather than for the benefit of officers, members of families, and employees, as individuals." Report of the United States Delegation to the United Nations Conference on Consular Relations, Vienna, Austria, March 4 to April 22, 1963).

the obligations in Article 36(1)(b) "enhance the ability of the sending States to assist or protect their nationals," the right of assistance "belongs entirely to the sending State." *Id.* As a general matter, I readily agree that the basic purpose of Article 36 is to facilitate and promote consular functions, which functions include protecting the interests of detained nationals. *Id.* at 855. As the Supreme Court has explained, however, there is no "right of assistance" under Article 36(1)(b); if a right exists, it is the right to notification. *See Sanchez-Llamas*, 126 S.Ct. at 2681. Regardless of whether the right is to notification or to assistance, I am troubled by the conclusion that the right belongs strictly to the sending States because it ignores the obvious import of the plain language in Article 36(1)(b)(3), which I have already discussed.

I also have concern over the requirement seemingly imposed by *Cornejo* and the majority in this case that an express remedy must exist in the treaty in order to find an individual right.[19] To my mind, where a plaintiff has not asserted a private right of action under a particular statute (or, as in this case, a treaty), the

_____

[19] *Cornejo* notes that "the Treaty does not provide expressly for private damage actions. Rather, the plain words of the Treaty provide that the notification right 'shall be exercised,' not that the failure should be compensated." *Cornejo*, 504 F.3d at 861, n.14 (quoting dissent in *United States v. Lombera-Camorlinga*, 206 F.3d 882, 895 (9th Cir. 2000)). Relying on *Cornejo*, the majority likewise finds it significant that the Convention does not contemplate private damage actions. *See ante*, at 10.

analysis of whether a private right exists should be conducted separately from the analysis of whether a remedy for the violation of that right is available. *See, generally, Gonzaga University v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). Had Gandara brought his claim directly under the Vienna Convention, seeking a remedy within its text would make sense. *See, e.g.*, *Sanchez-Llamas*, 126 S.Ct. at 2678. Here, however, it does not make sense because Gandara seeks to vindicate the violation of his Article 36 rights not via the Convention itself but instead through § 1983 or § 1350, which *arguably* supply the remedy.[20] *See Gonzaga*, 536 U.S. at 284.

---

[20] *Cornejo* and the majority conclude that Gandara cannot bring a claim for damages under §1983 for violation of the Convention because he has no judicially enforceable individual right to do so. In this special concurrence I have addressed only the question of whether Article 36 confers individually enforceable rights, not whether a remedy for the alleged violation of Article 36 exists under § 1983 (or § 1350). Given that the right in Article 36(1)(b), to the extent it may exist, is a right of notification as opposed to a right of assistance, *see Sanchez-Llamas*, 126 S.Ct. at 2681 and discussion, *infra*, it is difficult to imagine what relief could be fashioned to remedy a violation, beyond injunctive relief, even under our domestic law. In this regard, I would note that I appreciate the concern raised by *Cornejo* and the majority over "conjur[ing] a legal theory that might expose individual officers, to liability for breaches of international treaties."*Cornejo*, 504 F.3d at 861 n.14. Due to the speculative nature of any injury resulting from the violation of a right to notification conferred under Article 36(1)(b), however, even if the injury were compensable, I do not envision the availability of more than nominal damages and injunctive relief. *See Slicker v. Jackson*, 215 F.3d 1225 (11th Cir. 2000) (stating that "a § 1983 plaintiff whose constitutional rights are violated is entitled to receive nominal damages even if he fails to produce any evidence of compensatory damages . . . ."); *see also Sanchez-Llamas*, 548 U.S. at 2682 (suggesting that, assuming an individually enforceable right under Article 36 exists, in the proper circumstances a court could make "appropriate accommodations" to ensure that a criminal defendant secured the benefits of consular assistance through injunctive relief). Of course, in all cases brought against an individual officer under § 1983 for violation of the Convention qualified immunity would provide a defense to suit and in many cases would preclude a finding of liability.

32

Additionally, requiring the treaty to contain an express remedy in this case seems contrary to *Gonzaga*; it also seems contrary to the approach taken in *Breard* and *Sanchez-Llamas*, in which the Court first assumes the existence of a private right under the Convention and then proceeds to consider whether a remedy is available. *See Breard v. Greene*, 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L. Ed.2d 529 (1998) (*per curiam*) (stating that Article 36 "arguably confers on an individual the right to consular assistance following arrest" and then proceeding to determine that habeas claim was barred by state procedural default rules); *see also Sanchez-Llamas*, 126 S.Ct. at 2677-78 (assuming, without deciding, that the Convention creates judicially enforceable rights before applying procedural bar rule to claims asserted by habeas petitioner). In any event, in this case in which the plaintiff is not relying on the treaty itself for his right of action, I understand the question of whether there is a legal remedy to be a separate matter altogether from the question of whether the right exists.[21] In my view, conflating the two

---

[21] Although Article 36 does not mention a specific remedy or means of enforcing the rights in subparagraph (1)(b), it does arguably contain "remedy-type" language, which may suggest an intent by the signatory States that the article be judicially enforceable. As the Supreme Court has explained, "[t]he Convention does not prescribe specific remedies for violations of Article 36. Rather, it expressly leaves the implementation of Article 36 to domestic law: Rights under Article 36 are to 'be exercised in conformity with the laws and regulations of the receiving State.'" *Sanchez-Llamas*, 126 S.Ct. at 2678. Indeed, the Supreme Court has referred to this very language in holding that state procedural rules can operate as a bar to the post-conviction assertion of a violation of Article 36(1). *Sanchez-Llamas*, 126 S.Ct. at 2687 (holding that the Convention does not preclude the application of state procedural bars); *Breard*,

33

analyses confuses the issues.

As a final matter, notwithstanding all of the foregoing concerns, I should note that I take no issue with the well-settled propositions that the State Department's position is entitled to "great weight"and that the *travaux préparatoires* may be consulted in matters involving treaty interpretation. The question in Gandara's case, as I see it, is whether either may trump the plain language of Article 36.

In summary, based on the prior panel rule I concur in the result affirming the dismissal of Gandara's claim brought pursuant to 42 U.S.C. § 1983 (and 28 U.S.C. § 1350). In light of the concerns outlined above, however, I respectfully do not otherwise join the majority.[22]

---

523 U.S. at 379 (applying Virginia's procedural default rules to a Vienna Convention claim in the habeas context).

[22] As others have noted, issues raised in connection with Article 36 may have national significance because they may affect not only foreign nationals detained on our soil but also may have implications for U.S. citizens detained abroad. *See, e.g., Sanchez-Llamas*, 126 S.Ct. at 2692 (Breyer, J., dissenting, joined by Stevens, Souter, and Ginsburg, JJ.) (observing that the United States, as stated in the State Department's Foreign Affairs Manual, has long stressed the importance of Article 36's provisions to U.S. citizens who have been arrested or imprisoned outside our borders); William J. Aceves, *Murphy v. Netherland*, 92 Am. J. Int'l L. 87, 89-90 (1998) (noting that consular access serves the needs of foreign nationals and also, among other things, enables governments to monitor the safety and fair treatment of their citizens abroad).